IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

TAMARA TALLMADGE,
     Plaintiff,

v.                                      Case No. 3:19cv71/LAC/EMT

ANDREW SAUL, Commissioner of
Social Security,[1]
     Defendant.
_____/

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b) and NORTHERN DISTRICT OF FLORIDA LOCAL RULES 72.1(A), 72.2(D), and 72.3, relating to review of administrative determinations under the Social Security Act ("Act").  The case is now before the court pursuant to 42 U.S.C. § 405(g) for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Ms. Tallmadge's application for Disability Insurance Benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34.  Upon review of the record before the court, I conclude certain findings of fact and determinations of the Commissioner are not supported by substantial evidence and application of proper legal standards and that the Commissioner's decision, therefore, should be

---

[1] Andrew Saul is now the Commissioner of Social Security.  Pursuant to Fed. R. Civ. P. 25(d), he is automatically substituted for Acting Commissioner Nancy A. Berryhill as the Defendant in this suit.  The clerk is directed to update the docket accordingly.

reversed and the matter remanded for additional administrative proceedings, as set forth below.

## ISSUES ON REVIEW

Ms. Tallmadge raises two issues on appeal, arguing the ALJ erred in (1) "ignor[ing] the opinion of disability at which the Florida Bureau of Benefit Payments, Disability Determinations Section arrived, a determination that was due to be given great weight," and (2) giving little weight to Dr. Thomas Tan's opinion regarding the extent to which she would be absent from work due to fatigue (ECF No. 13 at 2).

## PROCEDURAL HISTORY

Ms. Tallmadge filed an application for DIB on November 6, 2015, alleging disability beginning February 18, 2015 (tr. 170–73).[2] Her claim was denied initially and on reconsideration (tr. 80, 99, 104–14). Ms. Tallmadge appeared for a hearing before an ALJ on August 6, 2017 (tr. 34–63). On February 7, 2018, the ALJ issued a decision denying Ms. Tallmadge's application for benefits (tr. 12–33). Ms. Tallmadge petitioned the Appeals Council for review of the ALJ's decision (tr. 1).

---

[2] The administrative record, as filed by the Commissioner, consists of seventeen volumes (ECF Nos. 4-1 through 4-17) and has 1900 consecutively numbered pages. References to the record will be by "tr.," for transcript, followed by the page number. The page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system or any other page numbers that may appear.

The Appeals Council denied the request (tr. 1–6).  The ALJ's decision thus became the final determination of the Commissioner.  That determination is now ripe for review.

## FINDINGS OF THE ALJ

In her written decision, the ALJ made a number of findings relevant to the issues raised in this appeal:

• Ms. Tallmadge has not engaged in substantial gainful activity since February 18, 2015, the alleged onset date (tr. 17).

• Ms. Tallmadge has the following severe impairments: multiple myeloma, hypogammaglobulinemia, degenerative disc disease of the lumbar spine, peripheral neuropathy, digestive disorders, and recurrent pneumonia (*id.*).

• Ms. Tallmadge does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526) (tr. 19).

• Ms. Tallmadge has the residual functional capacity ("RFC") to perform sedentary work, as defined in 20 C.F.R. § 404.1567(a), except she cannot climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs, stoop, kneel, and crouch; cannot crawl; can tolerate

occasional exposure to extreme heat and cold, humidity, wetness, fumes, odors, dust, gases, and poor ventilation; cannot operate foot controls; and cannot tolerate exposure to vibration, unprotected heights, or hazardous machinery (*id.*).

•      Ms. Tallmadge is capable of performing her past relevant work as a case supervisor, which does not require the performance of work-related activities precluded by her RFC (tr. 25).

•      Ms. Tallmadge has not been under a disability, as defined in the Act, from February 18, 2015, through February 7, 2018, the date of the decision (tr. 27).

<u>STANDARD OF REVIEW</u>

A federal court reviews the "Commissioner's decision to determine if it is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Substantial evidence is something

'more than a mere scintilla, but less than a preponderance.'" *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (*quoting Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. *Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986).

When reviewing a Social Security disability case, the court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner.]'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (*quoting Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)); *see also Hunter v. Soc. Sec. Admin., Comm'r*, 808 F.3d 818, 822 (11th Cir. 2015) ("In determining whether substantial evidence supports a decision, we give great deference to the ALJ's factfindings.") (*citing Black Diamond Coal Min. Co. v. Dir., OWCP*, 95 F.3d 1079, 1082 (11th Cir. 1996)). A reviewing court also may not look "only to those parts of the record which support the ALJ" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). Review is deferential to a point, but the reviewing court conducts what has

been referred to as "an independent review of the record." *Flynn v. Heckler*, 768 F.2d 1273 (11th Cir. 1985).[3]

The Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff not only is unable to do her previous work "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C. § 423(d)(2)(A). To be eligible for disability benefits, a claimant must prove she became disabled prior to the expiration of the date last insured. *See* 42 U.S.C. §§ 416(i)(3), 423(a) and (c); 20 C.F.R. §§ 404.101, 404.130, 404.131; *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

Pursuant to 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), the Commissioner analyzes a disability claim in five steps:

---

[3] The Eleventh Circuit not only speaks of an independent review of the administrative record, but it also reminds us that it conducts a *de novo* review of the district court's decision on whether substantial evidence supports the ALJ's decision. *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

1.  If the claimant is performing substantial gainful activity, she is not disabled.

2.  If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.  If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.  If the claimant's impairments do not prevent her from performing past relevant work, she is not disabled.[4]

5.  Even if the claimant's impairments prevent her from performing past relevant work, if other work exists in significant numbers in the national economy that accommodates the claimant's RFC and vocational factors, she is not disabled.[5]

At step five (or step four in cases in which the ALJ decides a claimant can perform past work), the ALJ formulates RFC through interpretation of the medical

---

[4] The claimant bears the burden of establishing a severe impairment that keeps her from performing past relevant work. 20 C.F.R. § 404.1512; *Chester v. Bowen*, 792 F. 2d 129, 131 (11th Cir. 1986).

[5] If the claimant meets her burden at step four, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. *MacGregor v. Bowen*, 786 F.2d 1050, 1052 (11th Cir. 1986).

evidence and the claimant's subjective complaints, based on the impairments identified at step two.  *See* 20. C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  "[R]esidual functional capacity is the most [a claimant] can still do despite [the claimant's] limitations.  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  RFC is then used by the ALJ to make the ultimate vocational determination required by step five.

## FACTUAL BACKGROUND[6]

Ms. Tallmadge alleges disability due to multiple myeloma, hypogammaglobulinemia, degenerative disc disease, peripheral neuropathy, digestive disorders, recurrent pneumonia, and other exertional and non-exertional impairments, including fatigue (ECF No. 13 at 2).  She was fifty-six years old on the date of alleged onset (tr. 170).  According to her testimony at the hearing, Ms. Tallmadge had a bachelor's degree in social work and past relevant work as a child abuse investigator and case supervisor (tr. 39).

Ms. Tallmadge testified she was unable to drive because of "problems with dizziness" (tr. 38).  She explained she was having "episodes of breaking down in a cold sweat and then getting dizzy and having to lay [sic] down"; she did not want this to occur while driving (*id.*).  She also said she was "having some stomach issues and . . . had times where [she was not able to make] it to the bathroom in time and

---

[6] The recitation of facts set forth below is derived from Ms. Tallmadge's testimony at the hearing before the ALJ and the administrative record.

[did not] want to be out in public like that" (*id.*).  When asked what prevented her from working, Ms. Tallmadge said "[s]ince [she] had [developed] the multiple myeloma slowly [she had] been experiencing different symptoms and . . . fatigue ha[d] been a big one" (tr. 40).  "Then [she] started getting bouts of pneumonia and . . . had a real bad bout in 2010 and was out of work for six months" (*id.*).  She "got back to work," but "never really healed from that episode" (*id.*).  Ms. Tallmadge said she "was experiencing dizziness and at times having to lay [sic] down at work because [she] was just tired" (*id.*).

"Then in 2014 and '15 [Ms. Tallmadge] experienced pneumonia three times" (*id.*).  She said "the second to the last time was during that February time frame and [she went] back to work for a day and it knocked [her] back down again and then finally because [she] got so much, [she was] not there for the—for [her] unit," she and her employer "felt it was necessary—. . . thought it was in the best interest of the department for [her]to put in for . . .  medical retirement" (*id.*).

When asked whether anything other than myeloma impacted her ability to work, Ms. Tallmadge said "[y]es, my lower back, part of the symptoms of the multiple myeloma is it causes weakness in the bones, especially in the back where it makes like little holes in the bones and I've been experiencing a little bit more of that each year" (tr. 40–41).  She said "[i]t's hard for me to stand up and then it gets hard for me to sit down.  So it's like I'm just sitting there up and down, up and down,

up and down" (tr. 41).  The ALJ asked whether there were any other problems, symptoms, or limitations that affected her ability to work (*id.*).  Ms. Tallmadge responded "[y]es, currently I'm dealing with a problem, a gastro problem.  I can't eat regular food, so I'm basically eating watermelon and popsicles because food causes me to throw up and they feel like I would have a blockage that they need to remove, but they're kind of trying to wait on it because they don't want to cause more scar tissue than I already have there" (*id.*).  "It causes diarrhea, you know unbelievable diarrhea that you don't even know when it's going to onset" (*id.*).

When asked about the prescription medication she was taking, Ms. Tallmadge said she was on the Fentanyl patch, which she took every other day (tr. 42).  She first began using the patches in 2011 (tr. 43).  Initially, she was using them every three days, "but that was hitting it," so her doctor "changed it to every other day" (*id.*).  She also was taking Crestor each night; Phenergan as needed, which typically was twice a day; Pristiq; and Wellbutrin (tr. 42).  And she took antibiotics and used a nebulizer when having bouts of pneumonia (tr. 43).

When asked how long she had been taking Pristiq, Ms. Tallmadge said she thought it was since 2011, "after [she] started having different bouts of illness" and she "just kind of got more and more depressed and so [her doctor] said . . . she felt like [she] was having depression issues as well.  So she put me on those and she had to increase them about a year ago to a higher amount" (*id.*).  The ALJ asked Ms.

Tallmadge whether the medication "effectively managed or controlled" the depression, and Ms. Tallmadge said "I don't know. I have a hard time getting up in the morning, and a hard time concentrating to get a task down [sic]" (*id.*). But she did not "know if [it was] because of depression or some other reason" (tr. 44). When asked about any other potential problems causing difficulty with concentration, Ms. Tallmadge said she had discussed it with her doctors and "fe[lt] like one of the issue[s was she was] not getting enough sleep" (*id.*). She said she had taken Ambien but "had a very bad episode with it and . . . didn't want to take it anymore" (*id.*). "So of course [she had not] been sleeping as well" (*id.*). As of the time of the hearing, she had "put in a prescription for Provigil and [was] going to see if that [would] make [her] concentrate more because hopefully [she would] be more alert and [her doctor had] tried a prescription . . . for the mind that [is] a medicine over the counter drug [sic]" (*id.*).

The ALJ asked Ms. Tallmadge whether she had ever had symptoms of depression or anxiety, or any mental health symptoms, that might affect her ability to work (*id.*). Ms. Tallmadge responded, "[y]es, the—I have the shakes real bad. I don't know what's that caused from. But the depression, it's just getting so hard— it's so hard for me to just get up and get going" (*id.*). Ms. Tallmadge said she did not "know if it's from the illnesses but . . . it's definitely there. I can't complete a task because I can't concentrate. It's just very frustrating" (tr. 45).

The ALJ then asked whether Ms. Tallmadge had problems concentrating after quitting work (*id.*).  Ms. Tallmadge testified "[y]es, ma'am, the completing tasks it's, my mother recently passed away unexpectedly and so [I] had to pretty much take care of the stuff at her house and I had to move it over to my house to go through" (*id.*).  "And I just you know, every day I get up and I'm like you know I need to get this—go through this and get it done.  And I just can't do it.  I just sit there [o]n the couch and when I get up[,] it, the back[,] starts hurting and I have to sit down.  And it starts hurting on my butt.  I just, just I feel like I'm just falling apart" (*id.*).

The ALJ asked Ms. Tallmadge whether there was anything else she would like to say about her medical condition (*id.*).  Ms. Tallmadge said "[w]ell, I guess—I know that with the fatigue and the concentration issues I really feel like that's part of the myeloma and I know that you know the myeloma is not going to get any better" (tr. 46).  Ms. Tallmadge said she had discussed treatment options with her doctor (*id.*).  When asked about the options, Ms. Tallmadge explained, "[i]t's a chemotherapy with four different kinds of drugs given in a—some sort of way.  It's like you know two days on, four days off.  They're all different.  They're all administered at different times" (*id.*).  Ms. Tallmadge clarified she had not yet undergone chemotherapy but had received intravenous immunoglobulin therapy ("IVIG") for her immune system, which made her "a little bit more alert" for a

couple of months (*id.*). She stopped receiving the injections, however, when her insurance company stopped paying for them (tr. 46–47). The ALJ asked whether Ms. Tallmadge discussed with her doctor options other than chemotherapy (tr. 47). Ms. Tallmadge replied that the insurance company starts with chemotherapy (*id.*). Ms. Tallmadge's doctor apparently mentioned the possibility of a procedure involving bone marrow and, if that was not effective, a procedure involving stem cells, the latter of which would not be covered by insurance (*id.*).

Upon questioning by her counsel, Ms. Tallmadge stated she was never the same after the six-month bout of pneumonia in 2010, during which she took medical leave from work (tr. 48). When asked what she was "doing to try to come back since then when [she was] working between then and 2015," Ms. Tallmadge said she "tried to do more . . . work at home because [at home she] could stop and then go, stop then go, but [then she] just, [she] couldn't do that anymore" (*id.*). She explained "it's difficult to supervise a unit of investigators when you have to go—be out there with them. I have to be able to see what they're seeing and I can't—I just can't go out with them" (*id.*). When asked what she meant when she said she could stop and go, Ms. Tallmadge said "[w]e have these risk assessments that we have to do on every case. And at the office I would just have to stay at the office and da, da, da, da, da—but I was taking some of my work home at night. But when I did that, then I was working more than eight hours. So it was really tearing me down even more.

And that's why it just, it's just things that started happening and I just couldn't keep up with it" (*id.*). She continued, "[a]nd I got really, really sick and that's what it was. I didn't even know it was that. I was going in for a cold. I thought it was a cold" (tr. 49).

Ms. Tallmadge's counsel clarified, "if I understand it, when you say you know I can go and stop, then go and stop, you were having to take breaks that you ordinarily—that you hadn't had to before?" (*id.*). Ms. Tallmadge replied "[r]ight, I would just stop, [lie] back in my recliner for a little bit and try again" (*id.*). Counsel asked "[o]kay and then as 2014 going into 2015 came on, was it—you had said you [fallen] farther behind, you just couldn't keep up. Am I correct in understanding that it was taking you longer and longer to get that work done?" (*id.*). Ms. Tallmadge responded "[y]es and that's when I started experiencing things like the lack of concentration, having to go—we had an office next to my office they had a bed in it, or a sofa in it and I would go [lie] down for a little while, but you know you always watch the door and make sure nobody sees, but I had fallen asleep at my computer a few times and I just—it just it was getting to the point that I could not do my work. I couldn't do it" (*id.*).

Counsel then asked about "foot drop," which was referenced in the medical records (tr. 49–50). Ms. Tallmadge said "[t]hat's basically what started this whole thing. I was dragging my foot and I fell at work and so they had me go in to be seen,

and as I was walking back I fell on my chest and so they wanted me to check and make sure it was okay, but when I was walking back to the treatment room, the doctor said why am I—why are you dragging your foot" (tr. 50). Ms. Tallmadge informed the doctor she was not aware she was dragging it (*id.*). And the doctor was "like yeah, you need to get that checked out. And so when [she] went back to work and . . . was telling them that, they [were] like oh yeah, you've been dragging your foot for a while and [she thought] that's what made [her] fall" (*id.*). Ms. Tallmadge continued, "[s]o, when I went to see my doctor, Dr. Chen[,] she did a battery of tests and I guess one of the tests she did is what found the multiple myeloma because since I've been—since I've been—since I found out I had it and I go to other doctors they say you know what do you have. And I say multiple myeloma" (*id.*). According to Ms. Tallmadge, the doctors asked how she knew she had the condition, and when she replied that her primary physician diagnosed it, one of her doctors responded, "God normally it's not—you can't find out about it until they're 60 years old usually" (*id.*).

Counsel next asked Ms. Tallmadge about the ways in which her mother helped with the "more or less administrative duties of [her] life" before passing (tr. 50–51). Ms. Tallmadge testified she "moved in with [her] mom so she could you know pretty much do this stuff for me. She took over my finances, doing my checkbook, paying my bills. She did all that . . . because I just couldn't do it anymore" (tr. 51). After

her mother passed, Ms. Tallmadge found someone to move in with her who was "kind of taking care of that" (*id.*).

When asked the reason she could no longer shop for groceries or engage in other similar activities, Ms. Tallmadge said "because I can't walk for a long period of time without it [being] just excruciating in the lower back, and so it's just easier for me to order it on Amazon but there's a few things that I can't like popsicles, because I live on popsicles . . . [a]nd protein drinks" (*id.*). At the time of the hearing, the last time she had left the house, other than for appointments with doctors or lawyers, was to drive a short distance to her mother's house to sign paperwork for the sale of her mother's home (tr. 51–52).

Finally, counsel questioned Ms. Tallmadge about her examination by Dr. Dawson on behalf of the Social Security Administration ("SSA"), which Ms. Tallmadge said lasted five minutes (tr. 53). She said Dr. Dawson had her sit on a table, used his hands to check underneath her ears and the back of her neck, and then listened to her heart (*id.*). He then told her to get off the table and bend over, which she had trouble doing (*id.*). After that, Dr. Dawson walked her out to the hallway and asked her to "read the letters on the end of the thing, and all [she] got out of the whole thing was one of [her] eyes is real bad" (*id.*).

James Cowart, a vocational expert, also testified at the hearing. Mr. Cowart identified Ms. Tallmadge's past work as criminal investigator/case supervisor,

which has a medium exertional level under the Dictionary of Occupational Titles ("DOT") (tr. 54).[7]  Mr. Cowart testified Ms. Tallmadge had transferable skills of inspecting, testing, looking for irregularities, tending and guarding, forming abstract ideas, and working with the public (tr. 55).  The ALJ asked Mr. Cowart if any of the corresponding jobs would transfer to the sedentary level of exertion, and Mr. Cowart responded "[n]o, ma'am . . . none of the transferable skills would go below light. They would all require an[] individual with these skills to be on their feet for six hours out of an eight-hour day" (*id.*).  The ALJ asked Mr. Cowart whether there would be jobs utilizing the skills identified if the individual was working in an office setting rather than out in the field (tr. 56).  Mr. Cowart said there would be and identified the jobs of communications center coordinator, congressional district aide, and dispatcher (*id.*).

The ALJ asked Mr. Cowart to consider the following hypothetical:

An individual of the claimant's age and education and with the past job you described.  Limited to the sedentary level of exertion; . . . [with] no climbing ladders, ropes, or scaffolds; occasional climbing ramps or

---

[7] Mr. Cowart initially identified Ms. Tallmadge's past work as criminal investigator (tr. 54).  Ms. Tallmadge apparently disputed the classification, and the ALJ clarified that Ms. Tallmadge supervised other investigators and asked Mr. Cowart whether criminal investigator was the only DOT classification for a supervisor within a child protective services organization (*id.*).  Mr. Cowart stated that criminal investigator was the appropriate DOT title for both supervisor and investigator (*id.*).  The ALJ later pointed out that a vocational consultant who previously reviewed the case identified Ms. Tallmadge's past work as caseworker supervisor under the DOT and asked why Mr. Cowart chose the investigator title instead (tr. 57).  Mr. Cowart explained that he chose the investigator title because of the investigation involved in Ms. Tallmadge's work (*id.*).  Mr. Cowart then confirmed the caseworker supervisor and criminal investigator titles involve the same transferable skills (tr. 57–58).

stairs; occasional stooping, kneeling, crouching, and no crawling; occasional exposure to extreme heat, extreme cold, wetness, humidity, fumes, odors, dust, gases, and poor ventilation. No operating foot controls, no exposure to vibration, no exposure to unprotected heights or hazardous machinery.

(tr. 58). The ALJ asked whether such an individual could perform the job of case supervisor or any of the other sedentary jobs Mr. Cowart identified that utilize Ms. Tallmadge's transferable skills (*id.*). Mr. Cowart responded "[n]o, ma'am" and explained "the necessity of being outdoors, the necessity to drive to and from would violate the hypothetical that you gave for humidity and wetness as well as foot controls" (tr. 58–59). The ALJ asked Mr. Cowart to consider only the DOT description of case supervisor and whether there was anything in that description that would preclude the hypothetical individual from performing the job (*id.*). Mr. Cowart said "[t]he only thing that would [be] different [would] be [that the social work supervisor job] usually requires a Master's Degree" (*id.*).

Ms. Tallmadge's counsel also questioned Mr. Cowart. Counsel asked Mr. Cowart to "assume an individual with the same limitations identified by the Court in hypothetical one, but [with] the additional limitation that they could sit, stand, or walk for only an hour and needed to have a sit/stand option" (tr. 60). Counsel asked whether the additional restrictions would eliminate the jobs Mr. Cowart identified (*id.*). Mr. Cowart responded "[n]o, sir" (*id.*). Counsel asked if "[t]he ability to sit for only an hour wouldn't interfere with the ability to perform sedentary work" (*id.*).

Mr. Cowart said "[i]t would, I'm sorry I understood you to say stand. Sit would diffuse all of those jobs, yes" (*id.*). Counsel next asked whether it would "be possible to perform any of the jobs . . . identified using the sit/stand option" (*id.*). Mr. Cowart replied "[y]es, all of them would be available to sit/stand option. The only limit would be the total amount of time required to sit" (*id.*). Counsel asked "[i]f a[n] individual with the same limitations identified, vocational limitations identified by the Court in hypothetical one had the additional limitation that they would be absent from work two or more times per month due to exacerbations of pain or other medical issues, would that person be able to maintain employment in the economy" (*id.*). Mr. Cowart responded "[n]o, sir," and confirmed the limitation would eliminate the jobs previously identified as well as all other jobs (tr. 60–61).

When asked if a hypothetical individual with the limitations imposed in hypothetical one, who also needed to take unscheduled breaks five or more times a day, would be able to maintain employment, including the jobs previously identified, Mr. Cowart said it would depend on the length of the breaks (tr. 61). Counsel added that the breaks would be three minutes or more (*id.*). Mr. Cowart asked if the individual would have to leave her workstation (*id.*). Counsel clarified the individual would have to leave the workstation on two of the five breaks to get up and move around (*id.*). Mr. Cowart responded that such conditions would not impact employment (*id.*). Counsel asked about the impact of the individual being able to

concentrate and maintain focus for only twenty minutes at a time (*id.*).  Mr. Cowart
said such a condition "would preclude work" (*id.*).

## ANALYSIS

I.      Determination of Florida Dep't of Retirement Management Services

Ms. Tallmadge argues the ALJ did not properly consider the May 28, 2015,
determination of the Florida Department of Retirement Management Services
finding her eligible for disability retirement (tr. 347).  Generally, a finding of
"disability" by another agency is entitled to "great weight."  *See Bloodsworth*, 703
F.2d at 1241.  "Even when an agency's definition of disability differs from that of
social security law, if the agency's disability definition is construed in a similar
manner as the definition of disability under social security law, it is error for the ALJ
to not to give that agency's finding of disability great weight."  *Hughes v. Comm'r
of Soc. Sec. Admin.*, 486 F. App'x 11, 16 (11th Cir. 2012).  "Nor, if the other
agency's standard for determining disability deviates substantially from the
Commissioner's standard, is it error for the ALJ to give the agency's finding less
than substantial weight."  *Hacia v. Comm'r of Soc. Sec.*, 601 F. App'x 783, 786 (11th
Cir. 2015).  Indeed, "[b]ecause the ultimate responsibility for determining whether
an individual is disabled under Social Security law rests with the Commissioner, [the
Commissioner is] not bound by disability decisions by other governmental and
nongovernmental agencies."  SSR 06–03p, 2006 WL 2329939, at *6 (Aug. 9, 2006).

"In addition, because other agencies may apply different rules and standards than [the Commissioner] for determining whether an individual is disabled, this may limit the relevance of a determination of disability made by another agency." *Id.* Nevertheless, "the adjudicator should explain the consideration given to these decisions in the notice of decision for hearing cases and in the case record for initial and reconsideration cases." *Id.*

Here, the ALJ offered no explanation for the weight given, or not given, to the determination of the Florida Department of Retirement Management Services. In fact, although the ALJ acknowledged Ms. Tallmadge medically retired, the ALJ did not even reference the determination in her decision. The undersigned thus recommends the matter be remanded for an explanation of the consideration the ALJ gave the determination of the Florida Department of Retirement Management Services that Ms. Tallmadge was eligible for disability retirement.

II.    Dr. Thomas Tan

Ms. Tallmadge also argues the ALJ failed to identify good cause for not affording great weight to Dr. Tan's opinions regarding fatigue and absenteeism from work. In evaluating medical opinions, an ALJ considers numerous factors, including whether the doctor examined or treated the claimant, the evidence the doctor presents to support his opinion, and whether the opinion is consistent with the record as a whole. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). An ALJ may choose to

accept some conclusions, or restrictions, within an opinion while rejecting others.  If such a choice is made, in addition to explaining the overall weight given a particular medical opinion, the ALJ must explain "'with at least some measure of clarity the grounds for [a] decision'" to adopt particular aspects of a medical opinion.  *Winschel v. Comm'r Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (*quoting Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984)).  Failure to explain the rationale for crediting only certain aspects of an opinion will result in a reviewing court "declin[ing] to affirm 'simply because some rationale might have supported the ALJ's conclusion.'"  *Id*.

A treating source's opinion generally is entitled to more weight, and an ALJ must give good reasons for discounting such an opinion.  *See* 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2); *Winschel*, 631 F.3d at 1179.  The opinion of a non-treating physician, however, is not entitled to any deference or special consideration.  *See* 20 C.F.R. §§ 404.1502; 404.1527(c)(1), (c)(2); 416.902; 416.927(c)(1), (c)(2); *Denomme v. Comm'r, Soc. Sec. Admin.*, 518 F. App'x 875, 877–78 (11th Cir. 2013); *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1160 (11th Cir. 2004).  Moreover, opinions on certain issues, such as a claimant's RFC and whether a claimant is disabled, "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; *i.e.*, that would direct the determination or

decision of disability."   20 C.F.R. §§ 404.1527(d), 416.927(d); *see* SSR 96-5p. Opinions reserved to the Commissioner, even when offered by a treating physician, are not entitled to controlling weight or special significance.  *See* SSR 96-5p.  Indeed, "[g]iving controlling weight to such opinions . . . would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled."  *Id.*  Although a physician's opinions about what a claimant can still do or the claimant's restrictions may be relevant, therefore, such opinions are not determinative because the ALJ has the responsibility of assessing the claimant's RFC.  *See* 20 C.F.R. §§ 416.927(d), 416.945(a)(3), 416.946(c); SSR 96-5p.

Dr. Tan was Ms. Tallmadge's treating oncologist/hematologist.  Dr. Tan and Ms. Tallmadge's primary care physician, Dr. Alicia Chen, began treating Ms. Tallmadge in 2009 for smoldering multiple myeloma, a precancerous form of myeloma.  Toward the end of 2010 or beginning of 2011, Dr. Chen referred Ms. Tallmadge to David Bear, D.O., of the Emerald Coast Center for Neurological Disorders, for an EMG (tr. 296).  Ms. Tallmadge complained of numbness and tingling in her hands (*id.*).  The procedure yielded largely normal results, with no evidence of ulnar neuropathy, which had previously been found; brachial plexopathy; or cervical radiculopathy (*id.*).  Dr. Bear suspected diffuse sensory abnormalities caused by a diffuse small fiber disease process secondary to multiple myeloma (*id.*).

Several months later, Dr. Chen referred Ms. Tallmadge to Dr. Ken Smith of the Blue Ridge Neuroscience Center for assessment of right gluteal pain and bilateral foot tingling and numbness (tr. 323). Dr. Smith noted Ms. Tallmadge was unable to work at the time and had not worked since September 22, 2010 (*id.*). Dr. Smith diagnosed lumbar disc degeneration at L4-5 and L5-S1 with probable arachnoiditis; chronic low back pain; pain in the right leg; numbness in the feet, hands, and tongue; and a cystic lesion of T1-2 in the right neural foramina (tr. 325). Dr. Smith discussed treatment options with Ms. Tallmadge, "including continued observation and conservative treatment versus surgical intervention," as well as the "possibility that [Ms. Tallmadge] may continue to have some degree of pain, weakness, or numbness regardless of the treatment option selected" (*id.*). Dr. Smith found "no immediate indication for additional diagnostic studies" and made no changes to Ms. Tallmadge's "current treatment regimen," instructing her to "continue with the current medication therapy" (*id.*). Dr. Smith indicated Ms. Tallmadge could not return to work at the time and that "further work issues [would] be left to the discretion of her primary care provider" (*id.*).[8] No follow-up appointment was scheduled (*id.*).

---

[8] As discussed next, the record shows Ms. Tallmadge returned to work despite Dr. Smith's opinion of September 22, 2010, that she was unable to work. Indeed, Ms. Tallmadge alleges disability as of February 18, 2015, nearly four-and-one-half years after Dr. Smith rendered his opinion.

Based on Dr. Tan's notes, it appears Ms. Tallmadge returned to full-time work on or before July 30, 2012 (tr. 789).  When Ms. Tallmadge visited Dr. Tan on that date, Dr. Tan noted she "continued to do fairly well," with no pulmonary issues or infections, peripheral lymphadenopathy, or bone pain, but a mild cough (*id.*).  Dr. Tan indicated Ms. Tallmadge's "energy [was] actually slowly improving" (*id.*).  Ms. Tallmadge returned for a follow-up visit with Dr. Tan on January 25, 2013, on which date Dr. Tan indicated she was "doing about the same and continuing to work full-time" (tr. 861).  She had no peripheral lymphadenopathy and "no new cough or pulmonary symptoms and her exertional dyspnea [was] stable" (*id.*).  According to Dr. Tan, Ms. Tallmadge's status was "unchanged from six months ago" (*id.*).  Ms. Tallmadge remained stable through March 3, 2014, when Dr. Tan noted she "continued to do fairly well" (tr. 926, 1240–42).

On June 10, 2014, during a three-month follow-up visit, Dr. Chen observed Ms. Tallmadge continued to experience chronic neck and back pain, which Ms. Tallmadge rated a nine on a ten-point scale (tr. 567).  Dr. Chen indicated Ms. Tallmadge continued to use Fentanyl patches daily and continued to work, but that pain "inhibit[ed] her walking, only stretching" (*id.*).  Dr. Chen also observed Ms. Tallmadge did not "seem to get so many of those sudden sharp pain[s]" and was going to a chiropractor, which helped (*id.*).  Dr. Chen noted "Fioranl" helped with

back pain and headaches and that Ms. Tallmadge had recently started taking codeine daily, apparently for "flared headaches or neuropathy pain in her r buttock" (*id.*).

At her next appointment with Dr. Chen on July 30, 2014, Ms. Tallmadge reported she was sleeping only four hours per night despite taking Zolpidem and remained tired (tr. 551). She reported a lack of energy, dizziness, nausea, palpitations, and sweating about twice a week (*id.*). She also indicated she was having intermittent fevers and coughs (tr. 551). Dr. Chen diagnosed malaise and fatigue; palpitation; multiple myeloma, which was stable; chronic diarrhea, which was stable with medication; peripheral neuropathy; mixed hyperlipidemia, which was not well controlled; dysthymic disorder, which was fairly well controlled with medication; and hypokalemia (tr. 557).

On September 3, 2014, Ms. Tallmadge saw Dr. Tan for a follow-up visit (tr. 1243). She "continued to feel well aside from some increased fatigue which [was] related to increased stress at her employment" (*id.*). According to Dr. Tan, Ms. Tallmadge otherwise had "done well over the last six months and denie[d] any new hospitalizations, infections, or surgeries" (*id.*). She was to return for a follow-up visit in six months (tr. 1245).

Less than two weeks later, on September 12, Ms. Tallmadge saw Dr. Chen for a wellness examination and complained of difficulty breathing (tr. 541). Dr. Chen noted Ms. Tallmadge had hyperlipidemia and had "not been taking her [C]restor

lately" (*id.*). Dr. Chen also noted Ms. Tallmadge experienced insomnia but indicated she had been taking Zolpidem, which helped (*id.*). Dr. Chen further indicated Ms. Tallmadge's pain was controlled with Fentanyl and reduced to a four or five on a ten-point scale (*id.*).

The day after she saw Dr. Chen, on September 13, 2014, Ms. Tallmadge had a chest x-ray, which showed bilateral infiltrates in her lungs, suspicious for pneumonia (tr. 920). Ms. Tallmadge had additional x-rays on September 22 and October 7, which were largely normal (tr. 865, 918). When Ms. Tallmadge returned to see Dr. Chen on December 11 for a three-month follow-up, she reported a 103 degree fever the previous day that was effectively treated with Aleve (tr. 513). Dr. Chen reviewed the x-ray results with Ms. Tallmadge, which Dr. Chen found "unremarkable" (*id.*). Dr. Chen noted Ms. Tallmadge did not drink the recommended amount of water, reporting it was more difficult for her to drink water because of bypass surgery; Dr. Chen also observed, however, that Ms. Tallmadge had no "issues with tea or soda" (*id.*).

During an appointment on February 25, 2015 (one week after her alleged onset date), Ms. Tallmadge reported she had difficulty breathing the previous night and was having increased lower back pain (tr. 487). Ms. Tallmadge had a breathing treatment, which apparently did not improve her symptoms (*id.*). A chest x-ray revealed left lung base infiltrates, indicative of pneumonia (tr. 1234). Shortly

thereafter, on March 2, 2015, Dr. Chen noted Ms. Tallmadge was unable to work from February 25 through March 9 (tr. 717).

Four weeks later, on March 30, Dr. Chen completed a Certification of Health Care Provider for Employee's Serious Health Condition form certifying, for purposes of the Family and Medical Leave Act, that Ms. Tallmadge was unable to complete any of the tasks of her employment due to recurrent bilateral pneumonia and hypogammaglobulinemia, beginning March 18, 2015 (tr. 852–54). Dr. Chen indicated the condition could be expected to cause flare-ups that would prevent work once or twice a month (tr. 854). Dr. Chen also noted Ms. Tallmadge had multiple myeloma and a "[d]eclining clinical status" (*id.*).

On March 18, 2015, Ms. Tallmadge returned to Dr. Tan, who noted she felt bad and complained of fever, dyspnea, a non-productive cough, and chest congestion; she had been treated for pneumonia twice within the past six months (tr. 940). Dr. Tan wrote a note asking that Ms. Tallmadge be excused from work due to an acute illness until after April 1, 2015 (tr. 1307). As of March 26, Ms. Tallmadge's symptoms had "improved somewhat," although she still was coughing and had exertional dyspnea (tr. 857). She had IVIG therapy that day (*id.*).

On April 13, 2015, Dr. Chen indicated Ms. Tallmadge had malaise and fatigue, as well as a non-productive cough that woke her up at times, in addition to recurrent pneumonia (tr. 458). When Ms. Tallmadge returned to Dr. Tan for IVIG

treatment on April 16, Dr. Tan noted she was "doing much better"—that "[h]er cough and chest congestion ha[d] largely resolved with only a mild non-productive cough residual and no fevers or chills" (tr. 1255).  He also noted Ms. Tallmadge remained fatigued and was on leave from work due to pulmonary issues (*id.*).  Dr. Tan indicated Ms. Tallmadge was to see a  pulmonary specialist, Dr. Mark Scott, in about two weeks (*id.*).

Ms. Tallmadge saw Dr. Scott on April 28 (tr. 343–45).  Dr. Scott suspected the cause of Ms. Tallmadge's recurrent infections was an "immunocompromised state (due to a combination of multiple myeloma, hypogammaglobulinemia and hyperglycemia . . . .)" (tr. 344–45).  He indicated, however, that Ms. Tallmadge's pneumonia symptoms were completely resolved, and a respiratory examination was normal (tr. 343–45).

In May 2015, Dr. Tan and Dr. Chen completed Physician's Reports for the Florida Retirement System.  Both doctors opined Ms. Tallmadge was totally and permanently disabled due to multiple myeloma with hypogammaglobinemia, which caused osteoporosis, peripheral neuropathy, metabolic syndrome, hyperlipidemia, and recurrent pneumonias  (tr. 348-51).

Ms. Tallmadge had additional IVIG treatment on May 7, 2015, at which time Dr. Tan noted "marked improvement" in her cough and no chest congestion, fever, or chills; she had another treatment on May 28 (tr. 373, 376, 449, 1285–89).  Also

on May 28, the Florida Department of Management Services, Disability Determinations Section, notified Ms. Tallmadge she had been approved for disability benefits (tr. 347).

Ms. Tallmadge saw Dr. Chen again on June 4, 2015 (tr. 435). Dr. Chen noted Ms. Tallmadge had been approved for medical retirement but that the fatigue had improved (*id.*). She also noted Ms. Tallmadge had seen Dr. Scott for the "multiple and infiltrates" and that "he felt that they were healing and didn't feel she needed a follow-up chest x-ray or imagining study" (*id.*). Dr. Chen observed that Ms. Tallmadge was "still coughing (dry) periodically" (*id.*). During June and July, Ms. Tallmadge reported low back pain at levels between five and six (tr. 356–71). When Ms. Tallmadge saw Dr. Chen on September 10 for an annual physical, she reported pain ranging from a three to a five (tr. 404). The next month, on October 15, Dr. Tan noted Ms. Tallmadge's respiratory issues had improved, with no recurrent fever, cough, or chest congestion over the last three months after her last IVIG infusion; he also indicated Ms. Tallmadge remained chronically fatigued (tr. 757).

Dr. Tan completed another Medical Source Statement on November 17, 2015, in which he noted Ms. Tallmadge suffered from back pain and loss of energy and indicated she could sit, stand, and walk for only one hour each in an eight-hour workday and had to be able to move through the positions as needed (tr. 1336–37, 1645–46). Dr. Tan opined Ms. Tallmadge could occasionally lift up to ten pounds;

maintain focus and concentration on simple, repetitive work for only ten to twenty minutes; would likely miss five or more days of work per month; and would require five or more breaks beyond those which are customarily allowed in an eight-hour day (*id.*). Dr. Tan indicated these limitations, stemming from lack of energy and back pain, rendered Ms. Tallmadge disabled from full-time continuous employment (*id.*).

On January 5, 2016, Dr. John Dawson examined Ms. Tallmadge on behalf of the SSA (tr. 998–99). Dr. Dawson noted Ms. Tallmadge complained of fatigue, frequent pneumonia, weight loss, and neuropathy, all related to multiple myeloma, as well as low back and leg pain resulting from degenerative disc disease (tr. 998). Dr. Dawson observed tremors in both arms "of a relatively severe nature" (*id.*). With regard to the back, Dr. Dawson noted Ms. Tallmadge had pain when flexing forward, as well as a positive straight leg raise on the right side (tr. 999). He indicated "right sacral notch tenderness as well as paravertebral tenderness from L4 to S1 bilaterally" (*id.*). Dr. Dawson opined Ms. Tallmadge could lift and carry five pounds frequently and ten pounds occasionally; stand and walk for two hours, and sit for six hours, in an eight-hour work day; and use the upper and lower extremities for coordinated push/pull activities within the lifting restrictions (*id.*).

Ms. Tallmadge returned to Dr. Tan on February 4, 2016 (tr. 1344). Dr. Tan observed she remained chronically fatigued and had been stressed by the recent

passing of her mother (*id.*).  Ms. Tallmadge indicated she wanted to discuss the possibility of resuming a short course of IVIG infusions (*id.*).

Dr. Charles E. Moore, a state agency medical consultant, evaluated Ms. Tallmadge on March 24, 2016 (tr. 92–96).  Dr. Moore concurred with Dr. Dawson's opinion regarding Ms. Tallmadge's limitations; he also found Dr. Chen's opinion regarding Ms. Tallmadge's limitations unsupported by the medical evidence of record (*id.*).

Records from a June 24, 2016, visit to Sacred Heart Hospital indicate Ms. Tallmadge continued to have bibasilar infiltrates in her lungs, although the right lung had improved since April and the left lung was stable (tr. 1463).  When Ms. Tallmadge returned to Dr. Tan on June 29, 2016, she again indicated she wished to discuss resuming IVIG treatment (tr. 1466).  On March 13, 2017, Dr. Tan noted Ms. Tallmadge continued to experience chronic fatigue (tr. 1481).  He also indicated Ms. Tallmadge's insurer would not authorize IVIG infusions because her immunoglobulin levels were not low enough to meet the criteria (*id.*).

On July 14, 2017, Dr. Tan completed a Medical Source Statement in which he opined Ms. Tallmadge could lift up to five pounds occasionally; sit and stand for one hour, and walk for less than one hour, in an eight-hour work day; would have to shift positions every fifteen minutes; would require five additional breaks; was likely to miss five or more days of work per month; and could maintain focus and

concentration on simple, repetitive work for up to only ten minutes due to severe depression with anxiety, severe peripheral neuropathy, and adverse medication side effects, including weakness, lethargy, difficulty concentrating, and dizziness (tr. 1726–27).

Ms. Tallmadge sought emergency medical treatment on October 8, 2017, apparently due to fever and breathing difficulties (tr. 1815). Upon admission, she was extremely dyspneic (*id.*). X-rays showed bilateral infiltrates of the lungs (tr. 1816). The notes indicate, however, that Ms. Tallmadge's pulmonary condition had improved over the past several years. The provider noted Ms. Tallmadge had inflammatory pneumonitis that lasted for several years "but [that it] had subsided over the last several years" (tr. 1815). The provider explained Ms. Tallmadge "had episodes of recurrent bilateral pulmonary infiltrates and dyspnea and cough 5 or 6 years ago" but that "[h]er pulmonary symptoms gradually subsided and the process resolved on its own and she has had only minor episodes of acute bronchitis sporadically over the years" and "has not required maintenance IVIG" (*id.*).

During a follow-up visit on October 30, Dr. Tan noted Ms. Tallmadge had recently had two upper respiratory infections but was treated with antibiotics and Prednisone and that her pulmonary issues had improved to the point she was only occasionally wheezing, although she continued to have a non-productive cough (tr. 1800). Dr. Chen noted during a November 3 visit that a chest x-ray showed chronic

scarring and atelectasis in the left lower base of the lung (tr. 1850). Ms. Tallmadge rated her pain a level between five and seven (tr. 1851). A November 8, 2017, abdominal CT scan revealed moderate to severe lumbar dextroscoliosis and degenerative changes of the lumbar spine, most advanced at L4-5 (tr. 1798). When Ms. Tallmadge next saw Dr. Tan on December 4, he indicated she had been hospitalized twice in the past month due to respiratory issues but had been unable to receive IVIG treatment (tr. 1794). She was prescribed oxygen (*id.*). Ms. Tallmadge visited Dr. Chen on December 20, 2017, when Dr. Chen noted Ms. Tallmadge's headaches were getting worse; she was still on oxygen (tr. 1885). Dr. Chen indicated Dr. Tan intended additional IVIG treatment (*id.*).

The ALJ gave Dr. Tan's opinions little weight, finding them unsupported by his own treatment records and the record as a whole (tr. 23). With regard to the May 2015 Physician's Report in which Dr. Tan opined Ms. Tallmadge was totally and permanently disabled, the ALJ noted that

> [a]s of October 2015, just one month prior to the date of Dr. Tan's opinion, the claimant was generally doing well other than some chronic fatigue. She specifically denied having any recurrent fevers, cough, chest congestion, night s[w]eats or diarrhea and she did not report having any problems concentrating. The claimant's physical exam was unremarkable and her smoldering myeloma was considered stable. Subsequent treatment records document continued stable myeloma.

(tr. 23–24). With regard to the July 2017 form, on which Dr. Tan indicated Ms. Tallmadge was likely to miss five or more days of work per month and could

maintain focus and concentration on simple, repetitive work for only up to ten

minutes, the ALJ observed the following:

> The claimant's multiple myeloma has remained stable for the past
> several years with no severe recurrent pulmonary infections since 2015
> and has not progressed to overt myeloma. As of July 2017, the date of
> Dr. Tan's opinion, the claimant reported doing great with no
> complaints. The claimant has complained of back pain but [it] is
> generally well controlled with Fentanyl patches. The claimant reported
> in May and June 2017 that she was walking twice a day for thirty
> minutes . . . . The claimant was diagnosed with neuropathy prior to the
> alleged onset . . . but it has been stable since then and she has not
> required treatment from a neurologist since the alleged onset date. The
> claimant has not complained to Dr. Tan of adverse medication side
> effects, including difficulties concentrating. Moreover, Dr. Tan's
> opinion regarding the effect of any depression and/or anxiety is outside
> the scope of his expertise. In any event, Dr. Chen's treatment records
> do not support a finding of severe depression. Rather, the claimant's
> depression and anxiety are under fair control with prescribed
> medication and without the need for treatment with a mental health
> professional. The claimant only recently started complaining to Dr.
> Chen in May and June 2017of difficulties concentrating . . . . There is
> no objective evidence in the record, however, of problems with the
> claimant's concentration and she is not prescribed medication
> specifically to improve her concentration. The degree of absenteeism
> is likewise not supported by the record. The claimant requires only
> routine monitoring of her smoldering multiple myeloma once every few
> months with Dr. Tan. She also sees Dr. Chen only periodically for
> routine follow up. She has not seen Dr. Scott, the pulmonologist, since
> 2015. She reported she planned to see him after her 2017
> hospitalization for pneumonia.

(tr. 24).

Ms. Tallmadge does not dispute the ALJ's findings as set forth above; instead,

she faults the ALJ for not addressing the results of lab work or evidence of fatigue.

Given the fact the matter is being remanded, the undersigned need not determine

whether the ALJ's decision to give little weight to Dr. Tan's opinions is supported by substantial evidence. On remand, however, the ALJ should give Dr. Tan's opinions further consideration, bearing in mind that they are consistent with the opinions of Ms. Tallmadge's other long-time provider, Dr. Chen, and were rendered only after years of treatment, during which Ms. Tallmadge continued to work despite a "[d]eclining clinical status" (tr. 854) (and despite Dr. Smith's opinion that she was unable to work as early as September 2010, years earlier than the date she alleges she became disabled).

<u>CONCLUSION</u>

For the reasons set forth above, the undersigned finds the Commissioner erred in failing to address the disability determination rendered by the Florida Department of Retirement Management Services and that the decision, therefore, should reversed and the matter remanded for the purpose of explaining the consideration given the determination of the Florida Department of Retirement Management Services. Upon remand, the ALJ should also reconsider of the opinions of treating physician, Dr. Tan.[9]

Accordingly, it is respectfully **RECOMMENDED**:

---

[9] The court notes that, to the extent it reviewed the legal principles upon which the ALJ's decision is based, it conducted a *de novo* review. *See Moore*, 405 F.3d at 1208.

Accordingly, it is respectfully **RECOMMENDED**, pursuant to sentence four of 42 U.S.C. § 405(g), that the decision of the Commissioner be **REVERSED**, that the Commissioner be ordered to remand this case to the Administrative Law Judge for further proceedings consistent with this report and recommendation, and that the Clerk be directed to enter judgment and close the file.

At Pensacola, Florida, this 29th day of January 2020.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**



## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being a served a copy thereof. Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control. A copy of objections shall be served upon the Magistrate Judge and all other parties. A party failing to object a Magistrate Judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* U.S. Ct. of App. 11th Cir. Rule 3-1; 28 U.S.C. § 636.**